Today I'd like to call on Judge Chen who has a motion. Oh, that's right. Thank you, Chief Judge Post. I'd like to make a motion to admit someone to our bar. I move the admission of Jeffrey Thomas Hansen, who is a member of the bar and in good standing with the highest courts of New York and Washington, DC. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. I know these things, Chief, because Jeff has been my clerk for the past year and, you know, I've been a judge long enough to know that there's a certain rhythm where you see clerks come and go and so it's a little bit of a sad time but a happy time, too, to look back. And when clerks come through, one of the great joys is seeing them grow. Maybe they become a better writer or a better thinker, better speaker. And then there's other clerks. They are what they are and they don't change. And Jeff is the latter. And what I mean by that is... Don't worry, Jeff. I'll say something, but he's done it. It'll be nice. When Jeff came in, he was already pretty much a finished product. And what I mean by that is he was an outstanding lawyer, outstanding person, high functioning, and high character. So it's been a great asset and joy for me to work with him and rely on him for the past year. I know he's going to do great things and I won't be able to take any of the credit for it. I look forward to seeing where things go. So for all these reasons, I humbly ask for the court to grant my motion. Judge Warner. Well, I couldn't possibly top that. Holy cow, did he turn that around. I just wanted to add my thoughts because it's not often that we have the opportunity to get to know each other's clerks as well as I feel like I've had the opportunity to get to know Jeff. And I actually have to say, for whatever reason, I think he pulled the short stick and he worked on so many cases that I had with Judge Chen and I have had the opportunity to see and benefit from really great feedback from Jeff, which is unusual that I would have the opportunity to get to know somebody else's clerk and their work so well. And I really appreciate all the work you've done here, especially that work that has benefited me directly. So thank you for that. And I'm really going to miss you when you leave too. And I echo that too. It's been a delight, Jeff. So why don't you stand for the motion is granted. Do you solemnly swear that you will comport yourself as an attorney and counselor of this court to the law and support the Constitution of the United States of America? Congratulations. Now we begin. 16-2056, AAT BioQuest versus Texas Fluorescence. Mr. Yeager, whenever you're ready. Thank you. Dr. Minto, the chairman and founder of TechLabs is also here today. Shakespeare was wrong. The first thing we should do is get rid of the experts, especially in cases like this that are summary judgment cases that are so fact-specific on the prosecution history. KSR expressed concern that rigid preventative rules deny fact-finders recourse to common sense. Good counsel can help direct recourse away from common sense when the facts are bad by citing cases that are not really on point, like Union Oil on the written description aspect of this case, where they cited and supported, well, the structure's not necessary. Well, we cited the case of University of California versus Eli Lilly, where it says the structure is the proper case or proper written description. But the real damage in this case was done by an expert who wasn't really qualified in this area and didn't really take the time to get informed on this area. And not only that, but stood by and expanded his statements in the view of facts that we presented. The Dr. Minto's declaration. So what is your specific point with respect to the error in this case? The, this case is the expert declaration that undermined Teflab's affinity case, where we presented evidence of the commercial use of the compound, the prior art teaching through the BABTA 1980 paper, Dr. Minto's declaration, showing that the affinity version, the modification of position K to change the affinity to match flow, the market leading flow three and four eight, was necessary to take this H substitution because it was too, the affinity was too high, or the dissociation counts were too high with the methyls that had been used before. All of those things were disregarded by the trial court here because of the attack. Can we focus on what specific issue we're talking about? You led off talking about Eli Lilly and written description, and I didn't see your briefs using that as a basis for your appeal. So what issue are you talking about? I'm talking, the expert is a concern on anticipation case, which is the first issue, and in the second case, the expert was also undermined the written description, the expert declaration undermined the written description aspect, which was. Did you appeal the written description? I appealed it in terms of, it was cited as, I appealed it under the objectively unreasonable, the willfulness, the court cited it all including written description were objectively unreasonable. And so from that standpoint, I present that. All right. You're telling me you preserved your challenge to the written description validity question here through your argument on willfulness. Is that what you're saying? The court can do what's appropriate on that issue. I did not list it as another specific grounds on this appeal. That's correct. So why don't you focus on the grounds that you appeal? The focus on the appeal is anticipation. Okay. And your position is that there was a factual dispute that required the position on the appeal is that the prosecution history is fairly clear. The examiner rejected this compound twice as big anticipated. It was only after the field brief that said, this is a different compound than the flow to AM, which where the examiner maintained that rejection. And we presented evidence that showed, had the examiner understood the significance of that difference of that position was used to modify affinity and that affinity modification was routinely practiced and recommended. And that age was one of the claims substitutes on that for that very reason, to give you something intermediate between the methyl and the fluorine. So we presented the prior art that that was routinely used in 18 commercial compounds. Dr. Menta presented the dissociation constants to show that it was necessary to make that adjustment. Make sure I understand, are you arguing now that flow two out of 10, six, seven, three anticipates, is that the argument you're making? That that combination with the claims, it's just an inherent argument. The, the, the, the inherency of the prior art teachings. You can't, you can't dispute the fact that flow two doesn't disclose all the claim elements. There's two changes. So it can't be that flow two itself anticipates. It has to be something else. In combination with the inherent teachings of Chen as it relates to modification. Is that a 103 argument? That's a 102 argument because anticipation is a, it's also a 103 argument, but it's primarily, it's a 102 argument. But our case law has said, for example, when there are two embodiments disclosed. Yes. That you can't pick elements from one and elements from the other and pull them together to make an anticipation case. That has to be an obvious miscase. Not at two different embodiments. So how is your case different from that? Because I think that I'm bound by a number of cases that have definitely held what I just said, which is two embodiments disclosed in the same reference. Yes. You can't pick and choose and modify to pull them together. No matter how obvious it would be, it might be obvious, but not for anticipation. There are two responses to that. The first is that under the patent and trademark office examination rules, they consider inherency either directly by reference in the patent or indirectly by what's taught and well known in the prior art. So it is inherent. It's not that we're combining a flow three and a flow two example to say that. We're saying it's flow two with this modification that is inherent in that teaching. What does that mean, modification that's inherent in the teaching? I mean, I suppose if you could make an argument that, OK, look at the flow two compound, look at its chemical structure. Yes. Now there's something inherent in that structure that necessarily discloses the exact same chemical structure in flow eight. But what I'm hearing you say is something different, which is look at flow two, look at the chemical structure, look at the other teachings inside the Tian patent. And one of skill would be motivated to make little modifications based on other teachings in the Tian patent to make adjustments to flow two that then arrives at the chemical structure of flow eight. Now to me, that kind of thinking channels me towards a 103 analysis like Judge Moore was describing. On one hand, we wouldn't care necessarily how the patent got invalidated. But on the other hand, the difference between a 102 and a 103 rejection is the ability to bring in all of this other stuff, like the expert declaration on person of ordinary skill. Dr. Minow declared that he and Dr. Chen worked for five years to come up with this new class of indicators where it took the chelating properties of BAPTA and the visible indicators of fluorescein and rhodamine. They had five working examples. They didn't present all the things that didn't work. Now according to a strict genus species analysis, the only thing that's really covered by that patent are those five specific examples, even though they've opened up this entire area that are still the best indicators today. And I think if the council that... What if we disagree with that? That as a matter of law, we can't say that the Chen patent is limited to the actual five disclosed embodiments because it discloses other things that go beyond just... Conceptually speaking, it's describing a genus. Yes, it does identify five examples. But even if you were to say that it's limited to five examples, number one, that doesn't help you because you're trying to tell us you have a 102 argument and none of those five examples anticipate the flow rate. But number two, if you're... The reference is broader than just those five examples. There's an actual genus going on there. It is. It's wonderfully broad. It's the... I mean, it's the concept of how you combine these two. That's the invention of the Chen patent. When you say combine these two, what two things are you combining? The Chen claim that showed on one of these babta rings, on the unlinked babta ring, x is equal to methyl or hydrogen or fluorine or bromine or all of these substituents. So the reason for putting that in... Now, we wouldn't be here if that patent had gone ahead and put another paragraph in there and said, the reason that we're doing these substitutions is to change identity. It would be all in one spec. There wouldn't be any question that it's anticipated at that point. You'd have very clear support, explicit support. Now, because Chen invented this back in 1980 and the Chen patent on the visible indicators wasn't done until the late 1980s, it was just understood in that arc that those modifications were done for that purpose. So council, when they prepared that patent substitution, didn't bother to put that in there. It was just understood. According, in my argument, as it relates to anticipation, is that it's still inherent because it was taught since 1980. Anybody that was in this area of designing indicators knew that, and you can't take it out. You can't just disregard all of those affinity versions. So effectively, the argument is that flow two and flow three and flow one, all eight of those affinity versions that were claimed by Chen are inherent and anticipated in that Chen patent. You're into your rebuttal, so why don't you save your rebuttal and we'll hear from the other side. Thank you. Thank you. May it please the court, Krista Carter on behalf of Eppeli AET BioQuest. Good morning, your honors. TEF Labs' arguments lose sight of the forest for the trees. This is not a court of first impression, and it's important that we step back and look at the record that was before the district court and at what Judge Ryu did below instead of retrying the case on appeal. The case you just heard from Mr. Yeager. Well, we review summary judgment decisions to no vote, right? Yes, your honor, that's correct. And your opposing counsel is telling us that Judge Ryu did fact-finding in her summary judgment order to conclude that there was no anticipation. That's correct, and what... Well, are you... That's correct that she did that, or that's correct that that's what he said? That's correct that that's what he said. Why is that wrong based on when you looked at the analysis in A2559, where she appears to be weighing and evaluating the strength of two competing declarations and then ultimately concludes that she likes your expert declaration better? Your honor, I don't believe that's what the district court did. You might want to pull these pages out for yourself because I'm going to ask you specifically about what she says in them, so it'd probably be useful for you to have them handy. A2559 and A2560. Your honor, what the district court did on anticipation, the question before her, was whether TEFLabs provided clear and convincing evidence on each of the essential elements... No, the question before her on summary judgment is did they raise a genuine issue, a fact, assuming all facts and reasonable inferences in their favor, right? Isn't that the summary judgment standard? Right, and the key... You say it, say it out loud. What's the summary judgment standard? The summary judgment standard is whether TEFLabs, first, to win on summary judgment, they would have had to provide... No, that's not what they appealed. That's not what we're focusing on. They lost on summary judgment. So what was the summary judgment standard that should have been applied to your summary judgment motion of no anticipation? Whether there were issues of material fact for which the court should have allowed, should have deferred to trial. And what did the court actually say in its conclusion section on 2560? What's the standard that the court used when it says in sum and reaches a conclusion about your motion for summary judgment of no anticipation? In sum, I'll read it to you. AAT has failed to show that TEFLabs failed to demonstrate a clear and convincing evidence that the 165 patent was invalid because it was anticipated by prior art. I was so darn confused. First, I found the briefs very confusing in this case to begin with. But then I was so confused because when I read this, I thought, wait, I didn't think anticipation went to the bench trial. I thought anticipation was decided on summary judgment. But the standard that she's using here is definitely not the summary judgment standard. It's the trial standard. Am I wrong about that? Well, I believe that she set up the argument in setting up on whether summary judgment could be ruled against TEFLabs as we cited with Celatex and whether- Where did she say the standard properly with regard to whether summary judgment of no anticipation and whether there was a genuine question of material fact about no anticipation? Because I kind of feel like you people all led her down the wrong road and made it an either-or scenario. As though if she didn't agree with them that summary judgment of anticipation was warranted, then she should automatically grant your alternative summary judgment motion of no anticipation. But clearly, that's not how the world works. Right, and that is not what we advocated, Your Honor. What we advocated was that if TEFLabs failed to provide evidence on essential elements of its defenses, if they failed to raise any evidence on essential elements, that summary judgment was appropriate. Anyway, she didn't hold that. You tell me where in her opinion she held that, that she agreed with you that they failed to raise any evidence about an essential issue. Because the entire analysis is on these two pages. There's nothing else. For, so for anticipation, the first question Judge Ryu asked was where within the four corners of the Chen patent TEFLabs identified the identical invention of Flo-8 and whether Flo-8 was disclosed in Chen within the four corners as claimed and arranged in claim one of the 165 patent. And she holds, she finds that TEFLabs fails to identify where in Chen those two differences from Flo-2 compound were identified. And then moving on to the genus species argument, the question is whether a person of ordinary skill in the art would have envisioned a small subclass of compounds with common properties that included Flo-8-AM. TEFLabs offered no evidence from the perspective of a person of ordinary skill in the art. She didn't make any of these fact findings. These are what you're, while you're telling us you should win, but these aren't any of the fact findings she made. On appendix 2556, she does find that by 2557, TEFLabs' own admission, there are at least two differences. Right, but that's a different section in the disclosure of the genus section. See, his problem is he stood up here and argued Flo-2 the whole time. And honestly, that's what he argued mostly in his briefs. And he seemed to ignore the separate argument if he preserved it in his briefs as a real thing. But he seems to have ignored the separate argument as to whether claim one itself actually discloses the species and therefore anticipates. Because it does. It actually does. But you said, but wait a minute, but if discloses 20 billion possibilities, why would that one have been pulled out of that 20 billion? And that's wherein we end up devolving into a genus species case for sure. But that's what you're pointing to is whether Flo-2 anticipates. I agree with you. Hands down, Flo-2 doesn't anticipate. And you can't cherry pick other things from other parts of the patent and stick them into Flo-2 to tell me it anticipates. The only question I have is does claim one anticipate? That's my only question for you. He didn't necessarily preserve it and it may very well be waived. He sure as heck didn't say a word about it up here in oral argument and it's hard for me to find anything in the briefs on it. Nonetheless, as I read this, I was very troubled by the way she analyzed that issue. And by page 2559, where Judge Chen started, which appears to be a series of really fact findings on her part. I didn't like this expert. I did like this one. These people dispute whether this list is accurate. Those are the kinds of things that sound like fact findings. Well, Your Honor, what Judge Ryu did was find that the underpinnings of Teflab's arguments were flawed. First, again, backing up, the record that was before her was an undifferentiated mass of hundreds of pages of prosecution histories and other documents, including prosecution histories that weren't even in this case. So Teflab's never once pointed to Ware and Chen or to any other evidence to say that a person of ordinary skill in the art would have envisioned Float 8 within the subclass. What they did was have Dr. Minta put forward declaration testimony that where he was not qualified from the district court as an expert, he didn't offer it from the perspective of an ordinary person of skill in the art, which I believe Judge Ryu made a point of that their arguments aren't from the perspective of a person of ordinary skill in the art, which is the required perspective in this case. So is your argument maybe that on summary judgment our job is to look at the record and see if it supports what she did de novo as opposed to necessarily nitpick with some things that maybe she may be said in a way that I'm not so thrilled with? I believe your job is to see if the district court got it right to say that they did not present evidence to essential elements of its defense and the evidence that's to the essential elements would have to consist of evidence from the person of ordinary skill in the art, which they did not do. All that they did, if you look at particularized evidence is a couple of paragraphs from Minta which Judge Ryu found was not competent evidence. It wasn't a weighing of evidence. It's that they didn't even provide evidence to support their theory. They never argued. He wasn't an expert. He was a fact witness. He was not, right? He was not qualified as an expert. He offered expert testimony, which is precluded under federal rule of civil procedure 701. He's the co-inventor of the Chen pattern. He is. And at the outset of the case, TEFLEB said, we want early summary judgment. We want no experts. We want no depositions. Suppose what he was testifying to through his declaration was, what was the state of the art at the time of 2006? What kinds of embodiments or species from the Chen genus were actually being commercialized in the marketplace? And again, that's not the relevant question. I guess that's what I was, that's my follow-up question. What relevance is that? It isn't. When it comes to a 102 in trying to figure out how big of a genus does the Chen pattern actually disclose, the fact that maybe only 18 species of a potential billion genus have been commercially marketed, I don't see how that goes to the question of, why does that matter in terms of the four corners of the Chen pattern? What does it actually disclose? How many different embodiments are actually disclosed? That's a different question than, what would one of skill and the art be motivated to do based on the commercial marketplace of picking and choosing? That's right. So in looking at the essential elements, again, even if you take everything that Minta said is true, which the court found was not competent evidence, it wasn't proven to be a fact, it wasn't proven to be clear and convincing evidence even before our rebuttals. If you look at what he did, he's looking at 2006, which has no relevance to the four corners of Chen when Chen did the disclosure in 1987. If you look at the Chen patent and what they ignore is that Chen actually taught away from making other compounds like the Flo2 compound, which had non-electron withdrawing groups at the X position. Chen said, you need to have electron withdrawing groups at the X positions so because of this pH sensitivity of Flo2. Flo2 didn't work as a fluorescent indicator. The fluorescence was almost completely quenched and explicitly taught that for that reason, you move to a compound like Flo3, which has chlorines, which are electron withdrawing groups and not hydrogens. So he specifically taught away. So if you look at what a person of ordinary skill in the art would have understood to have been any disclosure of a subclass with common properties, you would not have included Flo8 or any other indicator with a non-electron withdrawing group at the X position. TEFLabs completely ignores that teaching from Chen, doesn't address it. They focus only on this K equals hydrogen, which is a different position, which grossly oversimplifies the complexity of these compounds because you wouldn't start with Flo8 and make modifications to come up with Flo... I'm sorry, you wouldn't start with Flo2 at the end of a synthesis product and make modifications to get to Flo8. You have to know the structure, envision the structure from the beginning before you start. Even if you would do that, it would only be obviousness. It wouldn't be anticipation like you can't start with Flo2 and modify it to get to Flo8 and call it anticipation. Well, I think best obviousness. Well, and I don't mean to make out their case better than it is, but they never say it. But I think what they're trying to argue is that this is the group of 36 is what a person would have envisioned based on Chen. They never say it that way. They never give them from the perspective of an ordinary skill in the art. And there's flaws with those 36. It's not clear and convincing evidence because it's from a perspective of 2006 where they didn't even prove that those compounds in 2006 were even the ones that were flow indicators on the market. They excerpt out and make characterizations that are not from the source reference. So essential elements they failed to even address from the perspective of a person of skill in the art. What Chen would have taught ignores teachings, comes up with other K equals hydrogen arguments, which isn't even focused on the right questions of the totality of the Chen teaching. And for those reasons, for failing to present even argument on essential elements, not addressing the question of what a person of ordinary skill would have understood from Chen's disclosure, not addressing the teaching away from the flow to compound with non-electron withdrawing groups. They failed on essential elements and summary judgment was appropriate against them with a finding of no anticipation. What's the status of the re-exam? I believe AAT BioQuest has filed a response, but there has been no decision. And I just submit to this court that the re-examination is not relevant here. It was not before the district court. Has the agency issued an office action yet? I know they issued an SNQ order granting the re-exam request, but have they issued an office action? I don't believe they have. And I just point out that the evidence presented in the re-examination was not before this district court, was not considered. Even if it were, I believe they fail on their burden of proof. Is it a 102 theory or 103 theory for the grant of the re-exam? I believe on both. I believe on both. CHEN by itself? CHEN by itself with explicit teachings from patents that are incorporated by reference into CHEN. And those patents that were incorporated by reference into CHEN were not before the district court. A different record than we have here. Different record. So the 209 and 432 patent, which TEFLabs' briefs rely on extensively, were not before the district court and are not properly before this court. So there's a lot more evidence and the finding that there was a question to open the re-examination is just based on whether this argument or these references would be important to an examiner. It's not a question on patentability and it's not a finding on patentability and there's no resolution there. But I submit it's not before this court. So the flow eight compound, that's what is patented in the 165 patent, right? That's correct. And the flow eight compound is part of the genus of the CHEN 673. Is that right? It is literally encompassed within the billions that are in the genus. So if someone practices the flow eight compound, are they infringing both patents? No, Your Honor, because it's not disclosed. So there's a difference between being literally encompassed and what is actually disclosed to a person of ordinary skill in the art. What's disclosed to say, I understand you're teaching this genus, this subclass with common properties. I understand I can't do it. There's no evidence in the record from TEFLabs on what that person would have understood. We did present, is that a disclosure question or an enablement question? Is it a question about, because I mean, it is actually disclosed along with a billion other things. But is it a question of whether it is enabled, whether one of skill in the art is enabled by this very, very, very, very broad disclosure to focus in and adopt this one? I don't know the answer. Under genus species law is very complicated. And so I don't know the answer. So can you help me? Is it a disclosure question or an enablement question? Well, it's both. And I think they're combined. So I don't mean enablement under 112. I mean, enablement under anticipation. The reference has to not only disclose it, but be enabling. There's definitely case law that discusses what from an enablement perspective. We did not follow that approach because we were responding to TEFLabs' arguments. But in terms of like you said, literally disclosed, and I would say it's literally encompassed, but not disclosed from the legal perspective of whether a person of ordinary skill in the art would have seen and understood the specific flow 8AM compound to be disclosed by this reference. Whether there's a small subclass with common properties that is disclosed and claimed by Chen. And we're saying that when we presented expert testimony, which by the way, was not challenged, the expertise, the evidence base, and his opinions were not challenged at the district court level by TEFLabs. They weren't challenged until its motion for either for reconsideration or for new trial after the fact. And AAT presented evidence despite the fact that TEFLabs failed on its burden to even raise evidence against each essential element. We nonetheless presented our own evidence to say, no, Chen didn't disclose flow 8AM because Chen taught away from using non-electron withdrawing groups at these expositions. TEFLabs in 2011 admitted that this was Chen's teaching by saying that it previously was thought that this PKA issue with the non-electron withdrawing groups was a problem and later experimentation showed that it wasn't. And what happened after, it wasn't TEFLabs' determining that the non-electron withdrawing groups would actually work. It was AAT BioQuest. AAT BioQuest came up with flow 8AM 17 years after the Chen disclosure, 17 years after the disclosure of flow 8, I mean, I'm sorry, after the disclosure of flow 3. And flow 8 had, is twice as bright as the next leading compound flow 4, which came out years after the Chen disclosure, better cell loading, less temperature sensitive. And TEFLabs wants you to believe that this compound was in the hands of those of skill in the art at the time of 1987 disclosure of Chen, that this compound, which is way better than anything in the market right now, didn't know it actually made it till 17 years later, even though it was so obvious that a person just had to change these few things from flow 2, which Chen taught away from, to come up with this flow 8 compound, yet nobody did it. So factually, factually, their argument is illogical, but if you actually look at what Chen taught in the record evidence, flow 8 was taught away from, nobody in the skill in the art at the time would have envisioned it to be within a subclass of compounds with common properties. TEFLabs makes no arguments about what the person of ordinary skill would have understood. Coming up with these 36 combinations, sort of in impermissible hindsight, never say what common properties those 36 combinations would have had. And the case law is very clear that this hindsight recombination, even if you're in hindsight looking at the disclosure itself and looking at the disclosure itself and recombining what is in Chen to come up with disclosures, like that's impermissible. You have to look at the reference to see what preferences are disclosed to see if the particular later claim species was claimed. And it wasn't. And TEFLabs failed to meet its burden on those issues. And I see that I've run over and I apologize. I'll just close by saying that the other issues are addressed in our briefs. Judge Ryu's opinions are before you. We submit that she did a thorough job with her analysis and that her ruling should be affirmed. Thank you. Thank you, Your Honors. I didn't check her exam last night. As of the night before, the last entry was January 10th when it was on the examiner's desk ready to do something. But they may very well be waiting for this court to do something first. Special dispatch is an interesting concept in the Patent Office. Undifferentiated masses. I thought I was doing the court a favor by presenting the prosecution histories because in the last 10 years or so, the only prosecution knife histories I've looked at have been PDFs that are nicely arranged, you know, where you see what you've got. I did not have any idea the court was going to print those out. When we got to trial, counsel had a PowerPoint presentation and I presented, or attempted to present a notebook, a tabbed notebook with the condensed portions that were relevant and the court declined either of those. That's not in the joint appendix. It is at the docket number 43, pages 5, and then later, page 29 in that same docket, I asked the court, the court again expressed concern about not having specific sites. I asked for permission to amend just to add page numbers and the response was absolutely not. You had your choice. You had your chance. You had your shot. I'm sorry. You had your shot. Rule 56 allows the court to ask for information if there's any question about that. So the court certainly had the ability to do that but was just pretty annoyed that we hadn't done it earlier. That was just a miscommunication. It was certainly an error on my part. Joe Cowe explained why Flow II was disfavored by Chin, who was a perfectionist. That's at page 2158 and it's a very concise explanation for why Chin said what he did in the patent and it's a very different take than what counsel's presented. I had the impression as the panel has noted that the court took the position basically if we didn't win and we're putting all our eggs in the summary judgment. If we didn't win summary judgment we're going to lose the case. It wasn't going to go to trial and that is what happened and I think the court is accurate to point out that some of those burdens weren't meant to satisfy a cross motion summary judgment. In particular as it relates to anticipation there's a lot of evidence out there. There's evidence of prior use. There's a BAVTA paper. There's a MENTUS declaration. The only thing actually in support of their motion was the plaintiff's expert which has been certainly disproven by the 209 patent which is the subject of the reexamination. One other point about reexamination it's not just on the 209 patent. The reexamination, the reason for granting substantial new questions of patentability on both obviousness and anticipation related to the teachings of the BAVTA paper which was in evidence below. The bottom line on this is that despite all the alleged advantages of flow 8 it still has 10% of the market or less and that's despite some significant cost advantages like half price to flow 4. So a lot of these things are overstated and I think those are pretty well developed in the brief. The primary defense that the plaintiff offers is that we didn't present a person of ordinary skill in the art. Now we explained early on why we didn't do that. We thought that was going to require an expert. We were going to be into depositions. We're going to be into trial. We couldn't afford to do anything. TEFLabs was either fortunate enough or unfortunate enough if you really look at it to have counsel that could attempt to present a defense in this case or we would have just had to concede the market for something we thought that MENTA had invented years ago. We explained why we didn't think a person of ordinary skill was required because in the case of a chemical patent precise structures can be determined and you can look at table 2 in the 165 patent and it's either there or it's not there. Further there were four obviousness rejections where a person of ordinary skill analysis was used by the examiner and the 112 rejection used a person of ordinary skill analysis explicitly. Neither of those were objective. Those were all uncontested. In the written description they admitted it, withdrew the compound and they never contested the fact that the person of ordinary skill would not find it in there. They attempted to just sneak it back in later. On obviousness they made secondary arguments and did teaching away that this flow too was so bad that nobody would make an AM version of it and they used secondary evidence of unexpected results but they never challenged a prima facie case of obviousness. All TEFLabs did on the obviousness portion of the case was present. It's a much stronger case because there are things the examiner did not know. The examiner did not know the importance of affinity. I apologize for going over all of your work. Thank you. We thank both sides and the case is submitted.